**IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION**

| | |
|---|---|
| TERRY R. REFFETT, JR.,<br>        Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY,<br>        Defendant. | Case No. 4:13-CV-04031-SLD-JEH |

**Order**

Now before the Court is the Plaintiff's, Terry R. Reffett, Jr.'s, Motion for Summary Judgment (Doc. 13), the Commissioner of Social Security's, Carolyn W. Colvin's, Motion for Summary Affirmance (Doc. 17), and the Plaintiff's Reply Brief (Doc. 20). The Plaintiff appeals from the denial of both her application for Social Security Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 USC § 405(g), and her application for supplemental security income (SSI) under Title XVI of the Social Security Act, 42 USC § 1383(c)(3). This matter has been referred for a Report and Recommendation. Text Order entered March 11, 2014. The Motions are fully briefed, and for the reasons stated herein, the Court recommends that the Commissioner's Motion for Summary Affirmance be DENIED and the Plaintiff's Motion for Summary Judgment be GRANTED.[1]

**I**

On October 21, 2010, Reffett filed a Title II application for DIB and a Title XVI application for SSI. Reffett alleged disability beginning on June 26, 2008 by

---

[1] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears as (Doc. 11) on the docket.

reason of the fact that his previous DIB and SSI applications were denied on June 25, 2008 and he did not appeal that denial. The claims were denied initially on December 27, 2010, and were then denied upon reconsideration on April 12, 2011. On June 1, 2011, Reffett filed a timely request for hearing concerning his applications for DIB and SSI. An initial hearing was held before the Honorable Diane Raese Flebbe (ALJ) on March 20, 2012, during which time Reffett was represented by an attorney. Following the hearing, the ALJ determined that Reffett was not disabled from June 26, 2008 to the date of the ALJ's Decision (April 3, 2012). Reffett's request for review by the Appeals Council was denied on February 21, 2013, making the ALJ's decision the final decision of the Commissioner. Reffett filed the instant civil action seeking review of the ALJ's decision on April 4, 2013.[2]

## II

At the time he applied for benefits, Reffett was 51 years old[3] and had previously worked as a material handler, janitor, production machine tender, and meat trimmer. Reffett lived with his wife and pre-teen and teenage stepsons in Monmouth, Illinois. On his Form SSA-3368, Reffett provided that the conditions that limited his ability to work were back and neck problems. (AR 175). On January 16, 2007, Reffett slipped on ice and he fell, landing on the back of his head, and from that point he complained of back pain.

---

[2] The Court cautions counsel for the Plaintiff and counsel for the Commissioner to take care in providing dates and references to the Administrative Record in the future. The dates cited by the parties should be the same, as there can only be one correct date for each action taken by the claimant, Social Security Administration, Appeals Council, etc. In this case, some of the parties' cited dates differed, yet each cited to particular pages of the Administrative Record. This issue was compounded by the fact that apparently not all of the dates included in the ALJ's Decision were correct. Moreover, in general, the dates the parties cite in their motions must be accurate and match the dates that appear in the Administrative Record. In this regard, the Court notes that Reffett's counsel repeatedly cited May 31, 2009 for a Consultative Examination though the date, clearly marked on the relevant document in the Administrative Record, was May 31, 2008.
[3] Reffett's own Memorandum in Support of his Motion for Summary Judgment incorrectly identified his age at the time he applied for benefits as 52 years old.

At the March 20, 2012 hearing before the ALJ Reffett testified that the pain caused by his claimed back issues was throbbing, nagging pain that included a burning pain that radiated down his legs so that he could not sit or stand for extended amounts of time and which made it very hard to walk. He also explained that the pain prevented him from getting a whole night's sleep, and that his back hurt all the time. He testified to falling three to four times a week because his legs would just go out from under him. He also testified that he cooks simple meals a little bit, and that it is very hard for him to do jobs around the house such as vacuuming, dusting, and laundry. He testified that it is hard to hold the newspaper because his arms get sore and it causes pain down his back. As for bathing and dressing, Reffett testified that he has difficulty getting in and out of the shower and that his wife sometimes helps him get dressed.

At the beginning of the hearing, the ALJ questioned whether Reffett was interested in considering amending his alleged onset date to go back six months to April 21, 2009 given his past work, such that it would be supported in this case to go beyond the strict application of the age categories in the grid. Reffett agreed to voluntarily amend his onset date to April 21, 2009, and so the ALJ first proceeded to question the VE.

The ALJ posed the hypothetical of an individual limited to light exertion work with a sit/stand option, no climbing ladders, ropes, or scaffolding, no work involving hazards such as dangerous machinery and unprotected heights, the need to avoid concentrated exposure to extreme cold, and only occasional climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling. The VE responded that Reffett would be unable to perform his past work. The ALJ next asked whether, with such limitations and the sit/stand option, there were jobs at the light exertion level that could be performed within those limits. The VE initially responded that the Dictionary of Occupational

3

Titles (DOT) was silent on the issue of a sit/stand option. The VE further responded:

> It is my opinion that there are some jobs at the light exertional level that could be performed with a so-called sit/stand option. My honest opinion is that it's the exception and not the norm and I think that so-called sit/stand option is more easily found or accommodated at the sedentary level, but I do believe there are some jobs. And I have witnessed some jobs, such as assembler of small products . . . I have observed work like that which is light exertional work (INAUDIBLE).

(AR 36). The VE further explained that the number of such jobs would require a reduction to allow for a sit/stand option and that there was no way to give a definitive answer on that. The ALJ asked the VE to exercise his professional judgment in answering, and that he determine the reduction in a way that was favorable to Reffett rather than to the Agency. The VE responded that there would be no more than 1,000 assembler of small products jobs that would allow for a sit/stand option. The VE also responded that the job of unskilled mail sorter would be another job, less than 1,000 of which would accommodate a sit/stand option. At the end of that colloquy, the ALJ stated that the hearing would go forward and that Reffett would not be held to the amended onset date of April 21, 2009.

Reffett's attorney then questioned the VE further, asking the VE whether the estimate of 1,000 jobs was more or less a guess, to which the VE responded, "More or less, yes." (AR 38). After more back and forth between the ALJ and Reffett's attorney on the issue of whether the VE made a "guess," the VE stated that he provided his answers based upon his best professional opinion.

After Reffett testified, the ALJ asked the VE additional questions. The ALJ modified the sit/stand option further by explaining that the individual has an ability to sit two to three hours at a time and to stand two to three hours at a time

within that standing and walking six hours a day, sitting six hours a day. The VE responded that, educating a guess, such a modification would increase the number of jobs he previously cited that would be available with that type of postural component. The ALJ then clarified with the VE that a sit/stand at will would reduce the number of available jobs for the cited job of small products assembler down to approximately 1,000, but that sit/stand at will would not reduce the number of available jobs for the cited job of mail clerk to the same extent.

The VE also testified that at 50 years old, Reffett acquired no transferable skills to light or sedentary. The VE testified that during the time prior to Reffett attaining the age of 50, and reducing Reffett's work to the sedentary level with only occasional climbing ramps and stairs, balancing, stooping, kneeling, crouching, crawling, no climbing ladders, ropes, or scaffolding, no hazards such as dangerous machinery and unprotected heights, and avoiding concentrated exposure to extreme cold with a sit/stand option, there would be sedentary or unskilled SVP level 2 jobs available including unskilled packaging, specifically ampoule sealer and vinyl assembler. The VE noted that there would be no reduction in the number of such jobs available for the sit/stand option. The VE also responded that an individual likely to miss work two days or more a month and one who is off task 20% or more of the day due to distraction from side effects of medication and increased pain could not sustain competitive employment of an unskilled nature. At the end of the hearing, the ALJ asked the VE whether his testimony, other than that based upon his experience, was based upon the DOT or consistent with the DOT. The VE responded in the affirmative.

### III

Based upon all the medical evidence in the record, the ALJ determined that Reffett had the severe impairments of degenerative disc disease and obesity. In

finding that Reffett did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments, the ALJ stated in relevant part:

> The claimant's degenerative disc disease does not meet or equal Listing 1.04, disorders of the spine, because it has not resulted in the requisite compromise of a nerve root or the spinal cord, positive straight-let raising test (both sitting and supine), or inability to ambulate effectively.

(AR 13). Regarding Reffett's residual functional capacity (RFC), the ALJ concluded as follows:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: he can stand for 2-3 hours at a time for a total of standing and walking 6 hours a day; he can sit for 2-3 hours at a time for a total of sitting 6 hours a day; he cannot climb ladders, ropes, or scaffolds; he can occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; he can have no exposure to hazards such as dangerous machinery or unprotected heights; and he must avoid concentrated exposure to extreme cold.

(AR 13).

In making his RFC determination, the ALJ first addressed Reffett's testimony as to his cervical, thoracic, and lumbar spine pain and that it prevented him from a whole night of sleep as well as caused him trouble concentrating. The ALJ recounted the majority of Reffett's testimony at the earlier hearing. She also addressed what a consultative examination of Reffett revealed. The ALJ next discussed Reffett's medical records, including those from his treating physician, Mark B. DeYoung, M.D., MRIs performed in April 2009 and October 2010, and an EMG in July 2011. In a March 2008 physician note, Dr. DeYoung set forth a plan for Reffett that he needed to get his back into better shape and lower back exercises were demonstrated to him. (AR 588). The

assessment at that time was "[c]hronic low back pain, both musculoskeletal and degenerative disk disease in nature." (AR 588). Subsequent physician notes by Dr. DeYoung repeatedly assessed disk disease and set forth plans for different or new medications including epidural injections, and more than once Dr. DeYoung noted that he had no more he could offer for his patient in terms of the back pain about which Reffett continually complained.

The ALJ specifically discussed the results of an April 2009 MRI of Reffett's lumbar spine. The impression then was: "1. Degenerated L2-L3, L3-L4 discs with lateral herniation . . . is unchanged findings [sic] since 9/12/2007. 2. Findings suggestive of small extruded disk at the T11-T12 level, which is only partly visualized in these images and if clinically indicated, could be further evaluated with MRI of the thoracic spine." (AR 562). The ALJ also discussed the results of an October 2011 MRI of Reffett's lumbar spine providing the impression of "Little change in degenerative disc disease at L2-L3 and L3-L4," and the results of that same date's MRI of Reffett's thoracic spine providing the impression of "Multilevel degenerative changes. Stable bulge at T11-T12. There is no cord signal abnormality." (AR 593-95). In a February 2012 note, Dr. DeYoung's subjective findings noted that a review of Reffett's records showed x-ray findings unchanged dating back to 2007, and that Reffett had persistent pain and he was not getting any relief with Vicodin or his Neurontin. That same February 2012 note included objective findings of completely negative straight leg raising in both the supine and sitting positions, forward flex to just shy of 90 degrees, and ability to toe and heel walk. (AR 622). Dr. DeYoung once again noted in the "Plan" section of the February 2012 note that he did not have a great deal he could offer Reffett, that they would try a fentanyl patch to attempt better pain relief, that Reffett needed to lose weight, and that an attempt would be made to put Reffett in physical therapy. (AR 622).

The ALJ also identified findings (denervation suggestive of some radicular denervation in the L4, L5 nerve roots) made by Dr. Marc S. Katchen following EMGs[4] of Reffett's lower extremities in July 2011.  However, Dr. Katchen's examination of Reffett revealed no muscle atrophy of the lower extremities, strength testing of 5/5, and no specific pattern of sensory loss.

Dr. DeYoung's December 7, 2010 Medical Source Statement indicated that Reffett had no evidence of nerve root compression, he could sit or stand for 2-3 hours at a stretch and had to assume the alternate position for relief for 2-3 hours. (AR 601-02). The ALJ additionally discussed a March 18, 2011 consultative examination of Reffett which revealed a slow and guarded gait, no use of assistive devices, inability to toe/heel walk, 5/5 grip strength, limited range of motion in the cervical and lumbar spines, and negative straight leg raising both supine and seated.  (AR 610-13).

In rejecting Reffett's statements concerning the intensity, persistence, and limiting effects of his symptoms, the ALJ stated that, "His claims of extremely limited functional capacity are not demonstrated by the medical records," and the ALJ proceeded to cite various findings in Reffett's medical records.   In rejecting Reffett's father's and wife's statements, the ALJ stated, "The statements of the claimant's father and wife have been considered, but are discounted as, like the testimony of the claimant, they are simply not supported by the objective medical record."  (AR 15).

The ALJ stated that Reffett was a younger individual, age 18-49, on the alleged disability onset date and that he subsequently changed age category to closely approaching advanced age.  Finally, the ALJ found that based upon the

---

[4] Electromyography:  "a diagnostic procedure to assess the health of muscles and the nerve cells that control them."  http://www.mayoclinic.org/tests-procedures/electroconvulsive-therapy/basics/definition/prc-20014183 (visited March 31, 2015).

testimony of the VE and considering Reffett's age, education, work experience, and RFC, Reffet was capable of making a successful adjustment to other work that existed in significant numbers in the national economy and was therefore not disabled.

**IV**

Reffett argues five points: 1) the ALJ erred by failing to find Reffett met or equaled Listing 1.04(A); 2) the ALJ erred in assessing the credibility of Reffett's statements about his pain; 3) the ALJ erred in concluding Reffett had the RFC to perform light work; 4) the ALJ erred in concluding Reffett could do a sit/stand job at the light exertional level; and 5) the ALJ erred in applying the grids.

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. See *Schmidt v Apfel*, 201 F3d 970, 972 (7th Cir 2000); *Pugh v Bowen*, 870 F2d 1271 (7th Cir 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 USC § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v Barnhart*, 297 F3d 589, 593 (7th Cir 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v Bowen*, 782 F2d 79, 82 (7th Cir 1986).

Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v Perales*, 402 US 389, 390 (1971), *Henderson v Apfel*, 179 F3d 507, 512 (7th Cir 1999). Furthermore, determinations of credibility made by the ALJ will not be overturned unless the findings are clearly erroneous. *Anderson v Bessemer City*, 470 US 564, 573 (1985); *Imani v Heckler*, 797 F2d 508 (7th Cir 1986), cert denied, 479 US 988 580 (1986).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled.  Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability.  See 20 CFR §§ 404.1566, 416.966 (1986).  The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 USC § 1382(c)(a)(3)(A).  Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment.  *McNeil v Califano*, 614 F2d 142, 143 (7th Cir 1980).  The factual determination is made by using a five-step test.  See 20 CFR §§ 404.1520, 416.920.  In the following order, the ALJ must evaluate whether the claimant:

1)   currently performs or, during the relevant time period, did perform any substantial gainful activity;

2)   suffers from an impairment that is severe or whether a combination of her impairments is severe;

3)   suffers from an impairment which meets or equals any impairment listed in the appendix  and which meets the duration requirement;

4)   is unable to perform her past relevant work; and

5)   is unable to perform any other work existing in significant numbers in the national economy.

*Id.*  An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled.  A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled.  *Garfield v Schweiker*, 732 F2d 605 (7th Cir 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4.  However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment.  *Tom v Heckler*, 779 F2d 1250 (7th Cir 1985); *Halvorsen v Heckler*, 743 F2d 1221 (7th Cir 1984).

In the present case, Reffett claims error on the ALJ's part at Steps Three and Five.

## A

Reffett's first argument is that the ALJ erred by not finding that Reffett met or equaled Listing 1.04A.  Reffett takes issue with the ALJ's failure to mention one physician in her finding regarding Listing 1.04, says that the ALJ contradicts herself in her Decision in regard to Listing 1.04, and identifies portions of the record which Reffett asserts indicate that he met the criteria of Listing 1.04A.  The Commissioner counters that Reffett cites to, in large part, a May 2008 Consultative Examination by Dr. Afiz Taiwo which was in the period prior to that at issue in this case, and that the findings in that Consultative Examination are isolated.  The Commissioner also argues that while Reffett does not explicitly contend that he met Listing 1.04C, Reffett's assertion that the ALJ erred in finding that his impairment did not result in the inability to ambulate effectively implicates Listing 1.04C.  The Commissioner points out as to Listing 1.04C that Reffett has not identified any evidence in the record which shows that he meets that listing.

The criteria for Listing 1.04A are as follows:

Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With: Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 CFR Part 404, Subpt. P, App. 1, §§ 1.04, 1.04A. Here, the Commissioner correctly argues that the evidence of record that Reffett relies upon is isolated. Throughout the record, Reffett's straight leg raising tests were negative, including a straight leg test done by Dr. Taiwo in March 2011 which was more contemporaneous to the time the ALJ wrote her Decision. Notably, Dr. Taiwo's 2008 Consultative Examination does not indicate whether the straight leg raising test was both sitting and supine, and while Dr. DeYoung indicated a positive straight leg raising test on October 1, 2010, Reffett's straight leg raising test on October 19, 2010 was negative. (AR 570, 573). Clearly, substantial evidence supports the ALJ's finding that Reffett did not meet Listing 1.04A.

As for the Commissioner's 1.04C argument, the Court first notes that Reffett's Reply Brief addressing that argument is rambling and leaves the reader unsure of whether attention is to be paid to Listing 1.04C or not. So far as the Court can gather, the point Reffett tries to make in his Reply Brief is, as he states himself, "Equaling a Listing occurs when there are several contributing problems with different symptoms." (Doc. 20 at pg. 1). In support of that statement, he cites to his statement in the medical record that his legs give out on him at any moment without warning. He argues that, "*If* that condition kept occurring he

would have the need for an assistive device." (Doc. 20 at pg. 2) (emphasis added). The criteria for Listing 1.04C are as follows:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
> * * *
> Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 CFR Part 404, Subpt. P, App. 1, §§ 1.04, 1.04C. § 1.00B2b, in turn provides:

> Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 CFR Part 404, Subpt. P, App. 1, § 1.00B2b. The ALJ need not speculate on what the future may hold for a claimant, such as if a condition keeps occurring at some point in the future. Instead, the ALJ was required to consider all of the evidence before her at the time she made her decision as to whether Reffett's impairment or combination of impairments met or medically equaled the severity of one of the listed impairments at the time under consideration. The ALJ considered evidence on the required criteria that was favorable to Reffett and not just that evidence that was unfavorable to him, as the ALJ discussed the favorable evidence in her Decision. See *Curvin v Colvin*, 778 F3d 645, 650 (7th Cir 2015) (explaining that the ALJ's discussion of claimant's severe and non-severe impairments would not be discounted simply because it appeared elsewhere in the decision and finding that the ALJ's discussion at step 3 sufficiently met his

duty to articulate when considered in light of his discussion of the claimant's RFC).

Lastly, the Court will not consider whether Reffett's impairments equaled a listing because Reffett did not adequately raise or articulate the issue in his initial briefing. An argument not raised in an initial brief is waived. *Kenall Manufacturing Co v HE Williams, Inc*, 2012 WL 4434370, *3 (ND Ill). In his Motion for Summary Judgment Reffett merely concluded, after expressly arguing how his impairment of degenerative disc disease *met* the listed criteria in Listing 1.04A, that his "degenerative disc disease meets or *equals* the criteria of Listing 1.04A, and thus the ALJ's decision should be reversed." (Doc. 14 at pg. 11) (emphasis added). Furthermore, even if the argument was not considered waived in Reffett's initial brief, it was so insufficiently raised in his Reply Brief that the Court need not consider it. It is not the Court's duty to make arguments on behalf of the parties.

## B

In Reffett's second argument, he takes issue with the ALJ's assessment of the credibility of his statements about pain. Specifically, Reffett argues that the ALJ did not properly refer to State Agency physicians Dr. Taiwo and Dr. Arjmand, the latter of which stated that Reffett's allegations and reports were credible and consistent with the objective medical findings and the limitations indicated in the RFC assessment made by Dr. Arjmand, and that Reffett's description of activities of daily living were felt to be credible. (AR 554). Reffett recounts Dr. Taiwo's March 18, 2011 Consultative Examination and concludes that the ALJ did not do a critical review of the evidence where she ignored such significant state consultant information. Reffett also argues that the ALJ's rejection of his father's and his wife's statements lacked sufficient explanation. The Commissioner counters that the ALJ did not ignore Reffett's allegations, but

instead recounted his subjective complaints and provided her rationale for not accepting his self-identified limitations. As for the ALJ's alleged error in insufficiently explaining her rejection of Reffett's father's and wife's statements, the Commissioner states that those third-party statements were considered and the ALJ explained they were not supported by the objective medical evidence.

Determinations of credibility made by the ALJ will not be overturned unless the findings are patently wrong. *Shideler v Astrue*, 688 F3d 306, 310-11 (7th Cir 2012). "Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed." *Sims v Barnhart*, 442 F3d 536, 538 (7th Cir 2006) (citation omitted). SSR 96–7p instructs that when "determining the credibility of the individual's statements, the adjudicator must consider the entire case record," and that a credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." An ALJ should consider elements such as objective medical evidence of the claimant's impairments, the daily activities, allegations of pain and other aggravating factors, "functional limitations," and treatment (including medication). *Scheck v Barnhart*, 357 F3d 697, 703 (7th Cir 2004); *Rice v Barnhart*, 384 F3d 363, 371 (7th Cir 2004). "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele v Barnhart*, 290 F3d 936, 942 (7th Cir 2002).

Though the ALJ did not specifically refer to Dr. Arjmand's June 2008 RFC assessment nor go on at length about her reasons for rejecting Reffett's father's and wife's statements, the ALJ did not need to do so. See *Carlson v Shalala*, 999 F2d 180, 181 (7th Cir 1993) ("We have repeatedly stated that the ALJ need not evaluate in writing every piece of testimony and evidence submitted"); see also *Smith v Colvin*, 9 F Supp 3d 875, 888 (ND Ill 2014) (clarifying that an ALJ should

not simply presume a lay witness is biased and ignore that testimony on that basis, but an ALJ is also not required to incorporate lay witness statements into an RFC). Instead, the ALJ is required to sufficiently articulate her assessment of the evidence to assure the court that the ALJ considered the important evidence and to enable the court to trace the path of the ALJ's reasoning. *Carlson*, 999 F2d at 181. Here, the ALJ expressly discussed much of the medical evidence and Reffett's allegations and reports of pain that Reffett points to in his Motion for Summary Judgment. Moreover, as required by 20 CFR § 416.945(a)(3), the ALJ considered descriptions and observations of Reffett's limitations from his impairments provided by his family. See 20 CFR § 416.945(a)(3) (providing in part that, "We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons"). Though unadorned in some respects, the ALJ's credibility determination was sufficiently articulated to assure the Court that she considered the important evidence and to give the reviewer a fair sense of how Reffett's testimony was weighed. *Carlson*, 999 F2d at 181; *Steele*, 290 F3d at 942.

## C

Reffett's third point of error allegedly committed by the ALJ is that the latter wrongly concluded that Reffett had the RFC to perform light work. Reffett argues that the ALJ incorrectly interpreted Dr. DeYoung's Medical Source Statement, incorrectly rejected Dr. DeYoung's opinion that Reffett should be able to perform a desk job if he could be trained to do so, and that Reffett's persistent pain down his legs prevents the necessary standing and walking for light work. The Commissioner disputes that the ALJ misinterpreted Dr. DeYoung's Medical Source Statement, argues that Dr. DeYoung's opinion about Reffett's ability to do a desk job could never be accorded controlling weight, and argues that Reffett

provides no citation to any record evidence to support the assertion that his legs prevent him from performing the necessary standing and walking for light work.

> Light work involves:

> [L]ifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 CFR § 404.1567(b). SSR 83-10 provides, in part, that a job in the "light work" category is in that category when it requires a good deal of walking or standing which is "the primary difference between sedentary and most light jobs," and that "[r]elatively few unskilled light jobs are performed in a seated position."

The ALJ erroneously interpreted Dr. DeYoung's Medical Source Statement to state that Reffett could stand and walk for 6 hours a day and sit for 6 hours a day. Reffett argues that there is a difference in how Dr. DeYoung answered the questions on the form and how the ALJ interpreted Dr. DeYoung's answers. The ALJ's Decision discussed Dr. DeYoung's Medical Source Statement where he indicated that Reffett could sit for 2-3 hours at a time and stand for 2-3 hours at a time. (AR 15). The ALJ expressly incorporated into the RFC that Reffett had the RFC to stand for 2-3 hours at a time for a total of standing and walking 6 hours a day, and he could sit for 2-3 hours at a time for a total of sitting 6 hours a day. However, nowhere in the Medical Source Statement did Dr. DeYoung indicate that Reffett could stand and walk for 6 hours a day and sit for 6 hours a day. It is thus unclear where the ALJ came up with the total of 6 hours a day walking and

standing and 6 hours a day sitting.  Significantly, the ALJ has a duty to develop a full and fair record.  *Smith v Apfel*, 231 F3d 433, 437 (7th Cir 2000).  Here, while the VE understood the ALJ's questions to reflect Dr. DeYoung's Medical Source Statement as the ALJ ultimately presented it in the RFC, there was confusion at the hearing before the ALJ as to how the ALJ interpreted Dr. DeYoung's medical source statement, and Dr. DeYoung's Medical Source Statement did not, in fact, actually provide the 6 hour figure anywhere.  Given that the ALJ gave "great weight" to Dr. DeYoung's specific work restrictions in formulating Reffett's RFC and expressly incorporated those specific work restrictions into the RFC, and given the potential discrepancy between how Dr. DeYoung actually answered and how the ALJ interpreted the answers, it was error not to further inquire of Dr. DeYoung as to how he answered the question of Reffett's ability to sit or stand at a stretch and assume the alternate position for relief.

"The doctrine of harmless error . . . is applicable to judicial review of administrative decisions."  *Spiva v Astrue*, 628 F3d 346, 353 (7th Cir 2010).  Therefore, the Court ought not remand a case to the ALJ where it is convinced that the ALJ will reach the same result.  *McKinzey v Astrue*, 641 F3d 884, 892 (7th Cir 2011).  Here, for the reasons that follow, the ALJ's error in failing to clarify Dr. DeYoung's answers was harmless.

First, the ALJ did not commit error in rejecting Dr. DeYoung's statement that Reffett should be able to perform a desk job if he could be trained to do so because the ALJ determined that the statement decided an issue reserved to the Commissioner.  The statement clearly was interpreted by the ALJ to be a medical opinion by Dr. DeYoung rather than mere evidence relevant to the question of Reffett's RFC.  20 CFR § 404.1527(d)(2) provides:

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your

impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to this subpart, your residual functional capacity (see §§ 404.1545 and 404.1546), or the application of vocational factors, *the final responsibility for deciding these issues is reserved to the Commissioner*.

(emphasis added). In light of the above, the ALJ correctly rejected Dr. DeYoung's statement as a statement that decided an issue reserved to the Commissioner.

Second, the ALJ did not err in making her credibility determination that Reffett's claims of extremely limited functional capacity were not demonstrated by the medical records. The ALJ concluded that Reffett was not as limited by his severe impairments as he stated he was and so the RFC reflected only those limitations that were credible, resulting in an RFC finding that Reffett could perform "light work." As the Court discussed above, the ALJ's credibility determination was not patently wrong. Notably, as the Commissioner points out, Reffett provides no citation to any record evidence to support the assertion that he was unable to perform the necessary standing and walking for light work at the time the ALJ rendered her Decision. The Court is therefore convinced, given the record evidence and the ALJ's substantially supported credibility determination, that the ALJ would reach the same RFC finding (Reffett capable of performing light work) even if she were to interpret Dr. DeYoung's answers as Reffett says they are to be interpreted.

## D

The fourth issue Reffett argues is that the ALJ erred in concluding he could do a sit/stand job at the light exertional level. Reffett contends that SSR 83-12 makes clear that an individual who must alternate periods of sitting and

standing is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work and for the relatively few light jobs which are performed primarily in a seated position, or the prolonged standing or walking contemplated for most light work.  Reffett also emphasizes that SSR 83-12 provides that, "Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will."  He further takes issue with the VE's guess at the hearing as to the number of jobs available for purposes of the ALJ's consideration at Step Five of the sequential evaluation process. Finally, he takes issue with the alleged failure to determine how much he could lift or carry.  The Commissioner responds that Reffett failed to include that part of SSR 83-12 which states, "In cases of unusual limitation of ability to sit or stand, a [vocational expert] should be consulted to clarify the implications for the occupational base."  The Commissioner also responds that insofar as the ALJ asked the VE to consider an individual with Reffett's vocational history who was limited to "light exertion work with a sit/stand option," light work defined as lifting no more than 20 pounds at a time with frequent lifting or carrying objects up to 10 pounds, the ALJ did determine how much Reffett could lift or carry.

The Commissioner is correct in both instances.  Importantly, SSR 83-12 does provide that in the case of unusual limitation of ability to sit or stand, a VE should be consulted to clarify the implications for the occupational base.  Here, the VE was directly asked to clarify the implications for the occupational base at the hearing, and he responded accordingly based upon his best professional opinion.  The ALJ correctly relied upon the VE's testimony, given that the DOT is silent on the issue of a sit/stand option at the light exertional level.  See, e.g., *Overman v Astrue*, 546 F3d 456, 464 (7th Cir 2008) ("An ALJ is free to accept testimony from a VE that conflicts with the DOT when, for example, the VE's experience and knowledge in a given situation exceeds that of the DOT's

authors"). While Reffett's counsel questioned the VE's testimony as to his "guess" of how many jobs were available with a sit/stand option at the light exertional level, that challenge does not entitle him to remand here where the VE's testimony did not conflict with the DOT as the DOT was silent on the question.

Furthermore, the ALJ did determine how much Reffett could lift or carry when he made an RFC finding of "light work," which by definition includes lifting no more than 20 pounds at a time with frequent lifting or carrying of objects up to 10 pounds. 20 CFR § 404.1567(b). Finally, by arguing that the light exertional capacity is significantly reduced for Reffett given the evidence in the record of his limitations so that he cannot reasonably do light work, Reffett invites the Court to supplant the ALJ's findings with the Court's own assessment of the evidence. The Court will not and cannot do so. *Schmidt*, 201 F3d at 972.

### E

Finally, Reffett argues that the ALJ erred in applying the grids. He states that:

> It is not expected that one would manipulate the exertional levels just to deny a person disability under the GRIDS. With a finding that he has a high school education and is limited to sedentary work with skills not transferable he is disabled. Since the ALJ was going to apply the GRIDS to 6 months before [Reffett] became age 50 and her reason to change her mind has no merit, we ask that this case be remanded to find that he meets GRID Rule 201.04 that his skills are not transferable and he is limited to sedentary work so is therefore disabled.

(Doc. 14 at pgs. 18-19). The Commissioner counters that the ALJ did not state that she would definitely find Reffett disabled if he amended his onset date, but rather explicitly made it contingent on the testimony of the VE. See (AR 33-34) ("Perhaps we could switch the order of things and take some testimony from our

[VE] first *and see if that resolves our issues*") (emphasis added). 20 CFR § 404.1563(b) provides:

> How we apply the age categories. When we make a finding about your ability to do other work under § 404.1520(f)(1), we will use the age categories in paragraphs (c) through (e) of this section. We will use each of the age categories that applies to you during the period for which we must determine if you are disabled. We will not apply the age categories mechanically in a borderline situation. If you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case.

20 CFR § 404.1569, cited by Reffett, explains:

> The Dictionary of Occupational Titles includes information about jobs (classified by their exertional and skill requirements) that exist in the national economy. Appendix 2 provides rules using this data reflecting major functional and vocational patterns. We apply these rules in cases where a person is not doing substantial gainful activity and is prevented by a severe medically determinable impairment from doing vocationally relevant past work. (See § 404.1520(h) for an exception to this rule.). The rules in appendix 2 do not cover all possible variations of factors. Also, as we explain in § 200.00 of appendix 2, we do not apply these rules if one of the findings of fact about the person's vocational factors and residual functional capacity is not the same as the corresponding criterion of a rule. In these instances, we give full consideration to all relevant facts in accordance with the definitions and discussions under vocational considerations. However, if the findings of fact made about all factors are the same as the rule, we use that rule to decide whether a person is disabled.

(emphasis added). Here, remand is warranted on the basis of the ALJ's convoluted application of the grids. The Court engaged in a colloquy with the VE at the beginning of the hearing which revealed that, based upon the

22

hypothetical posed to the VE, there were jobs that existed for the hypothetical individual. The ALJ then stated, "So, Mr. Reffett, if we can go forward, and I will not hold you to that amended onset date." (AR 38). Later during the hearing, the ALJ asked the VE:

> Q. Okay. Now, there is a period of time prior to Mr. Reffett reaching the age of 50. At 50, I'm assuming Mr. Reffett has acquired no transferable skills to light or sedentary. Is that correct?
>
> A. I would agree with that. No, I don't believe -- his highest level of function was low end of the semi-skilled range and no, ma'am, I don't think there would be transferable skills.
>
> Q. So there is a time prior to Mr. Reffett attaining the age of 50 where if we reduced this to sedentary work with only occasional climbing ramps and stairs, balancing, stooping, kneeling, crouching, crawling, no climbing ladders, ropes or scaffolding, no hazards such as dangerous machinery and unprotected heights, avoid concentraged exposure to extreme cold with a sit/stand option. This is prior to the age of 50. Are there jobs that could be performed with these limits?
>
> A. Yes, at the sedentary or unskilled SVP level 2, yes.

(AR 52-53). In her Decision, the ALJ provided:

> The claimant was born on October 21, 1959 and was 48 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

(AR 16). The ALJ went on to state that transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supported a finding that Reffett was "not disabled" whether or not he had transferable job skills. The ALJ continued:

> If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.21 and Rule 202.14.

> However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as small products assembler . . . and mail clerk . . . .

(AR 17). Simply put, there is such a lack of clarity in the ALJ's Decision as to her evaluation at Step Five of the sequential evaluation process, in light of the evidence of record, that no meaningful review of her Decision in this regard can be made. *Craft v Astrue*, 539 F3d 668, 673 (7th Cir 2008). While she was not required to mention every piece of evidence, the ALJ was required to provide an "accurate and logical bridge" between the evidence and the conclusion that Reffett was not disabled. Id. Here, the ALJ did not do so where it is difficult to make sense of the way she proceeded at the hearing in regard to Reffett's age as a "younger individual" versus one "closely approaching advanced age," to then reach the conclusions that she did in her Decision as to his age and transferability of job skills. This case should be remanded for the ALJ to more cogently question the VE as to transferability of job skills, exertional levels, and age categories, and to sufficiently explain her application of the foregoing in her written Decision.

## V

For the reasons set forth above, the Court recommends that the Plaintiff's Motion for Summary Judgment (Doc. 13) be GRANTED and the Commissioner's Motion for Summary Affirmance (Doc. 17) be DENIED. The Court further recommends that this case be remanded pursuant to Sentence Four of 42 USC §

405(g) in order for the ALJ to more cogently question the VE as to transferability of job skills, exertional levels, and age categories, and to sufficiently explain her application of the foregoing in her written Decision.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) working days after service of this Report and Recommendation. FRCP 72(b)(2); 28 USC § 636(b)(1). Failure to object will constitute a waiver of objections on appeal. *Johnson v Zema Systems Corp*, 170 F3d 734, 739 (7th Cir 1999); *Lorentzen v Anderson Pest Control*, 64 F3d 327, 330 (7th Cir 1995).

Entered on April 2, 2015.


<u>s/Jonathan E. Hawley</u>
U.S. MAGISTRATE JUDGE